# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SCOTT JOHNSON, et al., ) | |
| ) | |
| Plaintiffs, ) | **CIVIL ACTION** |
| ) | |
| v. ) | **No. 2:22-cv-1243** |
| ) | |
| JUSTIN SMITH, D.V.M., ) | |
| in his official capacity as Animal Health ) | |
| Commissioner at the Kansas Department ) | |
| of Agriculture, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

On October 21, 2022, Scott Johnson, Harlene Hoyt and Covey Find Kennel, LLC ("CFK")

filed suit against Justin Smith in his official capacity as the Kansas Animal Health Commissioner.

Complaint For Declaratory Judgment And Injunctive Relief (Doc. #1).  Plaintiffs seek declaratory

judgment that the Kansas Pet Animal Act, K.S.A. §§ 47-1701 et seq., (1) authorizes

unconstitutional searches and includes unconstitutional conditions, in violation of the Fourth

Amendment and (2) infringes upon the fundamental right to travel.  Plaintiffs also seek injunctive

relief enjoining defendant from enforcing the portions of the Act which violate plaintiffs'

constitutional rights.  This matter is before the Court on defendant's Motion To Dismiss (Doc. #9)

filed January 3, 2023.  For reasons stated below, the Court sustains the motion.

## Legal Standards

In ruling on a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as

true all well-pleaded factual allegations and determines whether they plausibly give rise to an

entitlement to relief.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  To survive a motion to dismiss,

a complaint must contain sufficient factual matter to state a claim which is plausible—not merely

conceivable—on its face.  Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

To determine whether a complaint states a plausible claim for relief, the Court draws on its judicial

experience and common sense.  Iqbal, 556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions.

See id. at 678.  Plaintiffs make a facially plausible claim when they plead factual content from

which the Court can reasonably infer that defendant is liable for the misconduct alleged.  Id.

However, plaintiffs must show more than a sheer possibility that defendant has acted

unlawfully—it is not enough to plead facts that are "merely consistent with" liability.  Id. (quoting

Twombly, 550 U.S. at 557).  A pleading which offers labels and conclusions, a formulaic recitation

of the elements of a cause of action, or naked assertions devoid of further factual enhancement will

not stand.  Id.  Similarly, where the well-pleaded facts do not permit the Court to infer more than

the mere possibility of misconduct, the complaint has alleged—but has not "shown"—that the

pleader is entitled to relief.  Id. at 679.  The degree of specificity necessary to establish plausibility

and fair notice depends on context; what constitutes fair notice under Fed. R. Civ. P. 8(a)(2)

depends on the type of case.  Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008).

## Factual Background

Plaintiff's complaint alleges as follows:

### The Kansas Pet Animal Act

To operate a boarding or training kennel, the Kansas Pet Animal Act requires anyone other

than a licensed veterinarian to obtain a license.  K.S.A. §§ 47-1723(a), 47-1715(a).  The Act defines

a "boarding or training kennel operator" as "any person who operates an establishment where four

or more dogs or cats, or both, are maintained in any one week during the license year for boarding,

training or similar purposes for a fee or compensation."  K.S.A. § 47-1701(p).  An operator must

renew the license annually.  K.S.A. § 47-1723(a).

   To obtain a license or permit under the Act, an official must complete an initial inspection. K.S.A. § 47-1709(a).  An application "shall conclusively be deemed to be the consent of the applicant to the right of entry and inspection of the premises sought to be licensed or permitted . . . at reasonable times with the owner or owner's representative present."  Id.  If an applicant refuses the initial inspection, defendant may not issue a license or permit.  Id.  An official may notify the applicant when the initial inspection will occur.  See id.[1]

   Once the state issues a license or permit, officials conduct periodic inspections.  K.S.A. § 47-1709(b).  The "acceptance of a license or permit shall conclusively be deemed to be the consent of the licensee or permittee to the right of entry and inspection of the licensed or permitted premises . . . at reasonable times with the owner or owner's representative present."  Id.  In 2018, the Kansas Legislature decided that officials may no longer give prior notice of periodic inspections.

   During periodic inspections, inspectors may only (1) enter the licensee's place of business; (2) examine required records; (3) make copies of records; (4) inspect premises and animals as necessary to enforce the Act; (5) document conditions and areas of noncompliance; and (6) use a room, table or other facilities necessary for examination of records and inspection.  Kan. Admin. Regs. § 9-18-8; see also Kan. Admin. Regs. § 9-18-7 (required records).

   By regulation, an official must conduct a periodic inspection of the premises every 15 to 24 months if the premises passed its three most recent inspections; every nine to 18 months if it

---

[1]   In addition to boarding or training kennels, the Act requires the annual licensure of animal breeders, animal distributors, pet shop operators, animal shelters, hobby breeders, retail breeders, animal research facilities and out-of-state distributors.  K.S.A. §§ 47-1702 (animal distributor), 47-1703 (pet shop operator), 47-1733 (animal breeder), 47-1734 (out-of-state distributor), 47-1736 (retail breeder).  The Act's inspection provisions apply equally to these licensees.  See K.S.A. § 47-1709(a), (b).

passed its two most recent inspections; and every three to 12 months if it failed one of its two most recent inspections.  Kan. Admin. Regs. § 9-18-9(b).  A periodic inspection may also occur if (1) an inspector found a violation in a previous inspection; (2) a person files a complaint; (3) ownership of the premises changed within the previous year; or (4) the operator did not timely renew the license.  Kan. Admin. Regs. § 9-18-9(c).  The renewal application for a boarding or kennel license reminds the licensee of periodic inspections, and it contains a statement of consent that must be signed.  Applications for other regulated businesses contain the same consent provision.

Unless the parties agree on a different time, an inspection must occur between Monday and Friday, between 7:00 A.M. and 7:00 P.M.  Kan. Admin. Regs. § 9-18-8.  If the owner of the premises is unavailable during these times, the owner must designate in writing a representative who can be present during an inspection.  Kan. Admin. Regs. § 9-18-9(3).  The regulation does not limit the number of representatives an owner may designate.  Id.  If a licensee or designated representative is not available for inspection within 30 minutes of the inspector's arrival, the state imposes a $200 no-contact fee against the licensee, and the inspector must subsequently attempt to inspect the premises.  K.S.A. § 47-1721(d)(1).  If the licensee refuses inspection, an official may obtain an administrative warrant, and the state may suspend or revoke the license.  K.S.A. § 47-1709(b), (k).

Violations of the Act constitute a class A nonperson misdemeanor.  K.S.A. § 47-1715(a).  A violation may result in either a civil penalty not exceeding $1,000 or an educational course focused on the proper care and treatment of animals.  Id.  Notwithstanding any ongoing administrative or criminal proceedings, the state may obtain an injunction to prevent the unlawful operation of a facility.  K.S.A. § 47-1727.

Covey Find Kennel, LLC

Johnson owns and operates CFK.  Complaint For Declaratory Judgment And Injunctive Relief (Doc. #1) filed October 21, 2022 ¶ 11.  At CFK facilities, Johnson cares for, houses, feeds and trains hunting dogs.  Id. ¶¶ 36, 37, 40, 49.  Owners pay to kennel their dogs for "weeks, months, or years on end."  Id. ¶¶ 36, 43.

Johnson and his wife, Hoyt, jointly own the land on which CFK facilities sit.  Id. ¶¶ 11, 12, 26.  CFK's kennels are situated inside a fenced area behind a shop.  Id. ¶¶ 28, 33.  Johnson and Hoyt reside in a home west of the shop.  Id. ¶¶ 12, 28, 29.  Johnson and Hoyt can access the house through two gates: one between the shop and the property line and the other between the house and the shop.  Id. ¶¶ 28, 32, 34, 35.  The shop contains a mixture of work and personal items, and Johnson and Hoyt consider it part of their home.  Id. ¶ 29.

Some time around 1999, Johnson first learned from an inspector that he needed a license to operate CFK.  Id. ¶ 100.  The Kansas Department of Agriculture currently licenses Johnson as a training kennel operator as defined in the Act.  Id. ¶ 11.  Since Johnson obtained his license, officials have routinely inspected CFK's facilities, and Johnson has consented to the inspections.  Complaint For Declaratory Judgment And Injunctive Relief (Doc. #1) filed October 21, 2022 ¶¶ 5, 101, 103, 105.

Johnson travels throughout the Midwest, and sometimes beyond, for field trials, which are "essentially competitive events for dogs."  Id. ¶ 47.  Johnson has other people who help care for the dogs, especially when he and Hoyt are gone.  Id. ¶¶ 48, 118.  Johnson does not want the people who help him with the dogs to interact with inspectors, so Hoyt is the only designated representative for CFK.  Id. ¶¶ 118.  Accordingly, if Johnson is unavailable for a routine inspection, Hoyt can be present at CFK's facilities for the inspection.  Id. ¶¶ 12, 102.

Hoyt works as a clinic manager at a hospital, but she sometimes helps Johnson with CFK's operations and joins him on trips to field trials.  Id. ¶¶ 27, 45.  Because Johnson or Hoyt must be available within 30 minutes of an inspector's notice or risk a no-contact fee, they cannot travel together to cities more than 30 minutes away.  Id. ¶ 120.  Hoyt has also had to leave her job to meet an inspector.  Id. ¶ 121.  These travel restrictions make Johnson and Hoyt anxious and frustrated.  Id. ¶ 123.

Procedural History

On October 21, 2022 plaintiffs filed this suit.  Plaintiffs allege that the Act violates their Fourth Amendment rights and fundamental right to travel.  Specifically, plaintiffs assert that (1) in violation of the Fourth Amendment, the Act authorizes unconstitutional searches and includes unconstitutional conditions and (2) the Act violates their fundamental right to travel.  Plaintiffs seek injunctive relief enjoining defendant from enforcing the portions of the Act which allegedly violate their constitutional rights.

**Analysis**

In Count I, plaintiffs allege that in violation of the Fourth Amendment, the Act's licensing and warrantless search regime authorizes unreasonable and unconstitutional searches.  In Count II, plaintiffs allege that the Act's compelled consent requirement violates the unconstitutional conditions doctrine because it coerces Johnson to waive his Fourth Amendment rights.  In Count III, plaintiffs allege that the Act's 30-minute response time provision, designated representative mandate and no-contact penalties violate their fundamental right to travel.  Defendant seeks to dismiss all counts.

**I.    Unconstitutional Search**

In Count I, plaintiffs allege that by authorizing warrantless searches of licensed dog

boarding and training kennels, the Act violates their Fourth Amendment rights to be free of unreasonable, warrantless searches.  Defendant argues that (1) Count I fails because plaintiffs have consented to the kennel search and (2) because the state closely regulates boarding and training kennels, warrantless inspections of such kennels are reasonable under United States v. Burger, 482 U.S. 691, 703–03 (1987).  Plaintiffs respond that (1) the CFK facilities are part of their home and must be afforded the same heightened privacy expectations as a private residence and (2) in the alternative, because boarding and training kennels are not closely regulated businesses, the more relaxed Burger test does not apply.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The Fourth Amendment protects the privacy and security of individuals against arbitrary invasions by the government.  New Jersey v. T.L.O., 469 U.S. 325, 335 (1985).  The Fourth Amendment only proscribes searches that are unreasonable.  Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989).  Except in carefully defined classes of cases, a search of property is unreasonable unless it has been authorized by a proper search warrant.  See Camara v. Mun. Ct. of City & Cnty. of San Francisco, 387 U.S. 523, 528–29 (1967).  This rule applies to commercial premises and homes.  Marshall v. Barlow's, Inc., 436 U.S. 307, 312 (1978).

To start, defendant argues that Count I fails because by applying for and renewing their license, plaintiffs have consented to the searches.  Consent is a well-established exception to the warrant requirement.  See Soldal v. Cook Cnty., Ill., 506 U.S. 56, 65–66 (1992).  The Supreme Court has held, however, that where a statute authorizes warrantless inspections, consent is

irrelevant.  United States v. Biswell, 406 U.S. 311, 315 (1972).  Instead, "the legality of the search depends not on consent but on the authority of a valid statute."  Id.  Accordingly, the Court must address the Act's warrantless search regime.

Plaintiffs' assertion that the Court should treat the CFK facilities inspections as private residence searches is similarly misplaced.  The Supreme Court "frequently ha[s] noted that privacy interests are especially strong in a private residence."  Michigan v. Clifford, 464 U.S. 287, 296 (1984).  In Rush v. Obledo, however, the Ninth Circuit held that although a family day care provider has a strong privacy interest in her home, "the provider is aware that, when she is receiving compensation for caring for children other than her own in her house, regulations govern the operation and condition of her home which are different from those covering private residences."  756 F.2d 713, 717 (9th Cir. 1985).  The court reasoned that a "reasonable means of inspection is necessary to effectuate compliance with these regulations."  Id.  Like the home day care in Rush, even assuming that CFK facilities are part of plaintiffs' home, plaintiffs are aware that by receiving compensation to maintain a boarding and training kennel, regulations govern the operation and conditions of their facilities which are different from those which cover private residences.  See e.g., Kan. Admin. Regs. § 9-18-10 (general requirements for animal housing facilities).  Plaintiffs allege that since 1999, they have consented to periodic inspections, which is a condition to receive and maintain their kennel license.  Accordingly, the Court will analyze the challenged provisions under the administrative search exception.

A.    **Pervasively Regulated Industry**

Defendant contends that because boarding and training kennels are pervasively regulated, its policy of warrantless inspections is reasonable and does not offend the Fourth Amendment.

The expectation of privacy is particularly low for the narrow class of heavily or "closely

regulated" businesses—such as those that sell firearms and liquor—because the business owner has voluntarily decided to "subject himself to a full arsenal of governmental regulation." Marshall v. Barlow's, Inc., 436 U.S. 307, 313 (1978).  "Without elaborate enforcement schemes, the regulation of those industries would be ineffective." Big Cats of Serenity Springs, Inc. v. Rhodes, 843 F.3d 853, 865 (10th Cir. 2016).  The Supreme Court has emphasized that these "industries have such a history of government oversight that no reasonable expectation of privacy [can] exist for a proprietor over the stock of such an enterprise." New York v. Burger, 482 U.S. 691, 699 (1987) (quoting Marshall v. Barlow's, Inc., 436 U.S. 307, 313 (1978)).  Accordingly, individuals who choose to engage in such licensed and regulated businesses accept the burdens as well as the benefits of the trade.  See G. M. Leasing Corp. v. United States, 429 U.S. 338 (1977); Almeida-Sanchez v. United States, 413 U.S. 266 (1973).  To determine whether an industry is closely regulated, courts should focus on "whether the regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." Burger, 482 U.S. at 705, n.16 (internal citations omitted).

In City of Los Angeles, California v. Patel, for example, the Supreme Court held that hotels are not pervasively regulated.  576 U.S. 409, 424 (2015).  The Court reasoned that "nothing inherent in the operation of hotels poses a clear and significant risk to the public welfare" and that the regulations requiring hotels to "maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards" did not establish a "'comprehensive' scheme that puts hotel owners on notice that their 'property will be subject to periodic inspections undertaken for specific purposes.'" Id. at 424–25 (quoting Burger, 482 U.S. at 705).  The Court instead found that the challenged hotel regulations were "more akin to the widely applicable minimum wage and

maximum hour rules that the Court rejected as a basis for deeming 'the entirety of American interstate commerce' to be closely regulated." Id. at 425 (quoting Marshall, 436 U.S. at 314).

Maintaining dog training and boarding kennels is a pervasively regulated activity and has been the subject of federal and state regulation since at least 1976 and 1991 respectively.[2] See 7 U.S.C. § 2131, et seq.; 9 C.F.R. § 1.1 et seq. (federal regulations); 1991 Kansas Laws Ch. 152, § 22; 1996 Kansas Laws Ch. 151, § 6 (clarifying kennel operator includes boarding dogs for "training or similar purposes"). In fact, Johnson has known for over 22 years that his business is subject to extensive regulation, including regular inspections. Moreover, in a nearly identical case, a federal district court in Pennsylvania explained as follows:

> [B]y Plaintiffs' own contention, the industry is heavily regulated, hence the reason for this suit. Plaintiffs cannot successfully argue that the kennel industry is not pervasively regulated while at the same time maintaining that the kennel industry is too pervasively regulated. Regulations concerning the kennel industry in the areas of licenses, enforcement, fees, penalties operations, and various other provisions have been around for years.

Pro. Dog Breeders Advisory Council v. Wolff, No. CIV. 1:CV-09-0258, 2009 WL 2948527, at *9 (M.D. Pa. Sept. 11, 2009).

Kansas employs a comprehensive scheme to regulate boarding and training kennels rather than a "hodgepodge of regulations." Patel, 576 U.S. at 425; see K.S.A. §§ 47-701, et seq.[3] The

---

[2]    A version of the Act has been in effect since 1972.

[3]    To operate a boarding or training kennel, the Act requires the operator to obtain a license. K.S.A. §§ 47-1723(a), 47-1715(a). An operator must renew the license annually. Id. § 47-1723(a). To obtain a license or permit under the Act, an official must complete an initial inspection. Id. § 47-1709(a). An official may notify the applicant when the initial inspection will occur. Id. Once the state issues a license or permit, officials conduct periodic inspections. Id. § 47-1709(b). During periodic inspections, an inspector may enter the premises, check and photograph them, examine and make copies of records, and use a table or room necessary to conduct the inspection. Kan. Admin. Regs. §§ 9-18-8(a)–(f). By regulation, the state informs licensees when an official must and may conduct a periodic inspection. Id. §§ 9-18-9(b), (c). The
(continued . . .)

Supreme Court in <u>Patel</u> emphasized that the relevant regulations did not put hotel operators on notice that their property would be subject to periodic inspections undertaken for specific purposes. In Kansas, kennel operators have been on notice since at least 1991 that their business are subject to random inspections.  Regulations expressly detail when periodic inspections must and may occur.  <u>See</u> Kan. Admin. Regs. § 9-18-9(b), (c).  The Court therefore finds that the regulatory presence here is sufficiently comprehensive and defined such that owners cannot help but be aware that periodic inspections will occur and that the dog boarding and training kennel industry is pervasively regulated.  <u>See</u> <u>Wolff</u>, 2009 WL 2948527, at *9 (animal kennel industry pervasively regulated); <u>State v. Warren</u>, 439 P.3d 357, 364 (Mt. 2019) (same).

### C.    <u>Burger</u> Test

In <u>Burger</u>, the Supreme Court articulated a test to determine whether a warrantless inspection of a pervasively regulated activity survives constitutional scrutiny.  <u>See</u> 482 U.S. at 702. Specifically, the state must establish that (1) it has a substantial interest in regulating the industry which it seeks to inspect; (2) warrantless searches will further that interest; and (3) the regulatory scheme advises "the owner of the commercial enterprise that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." <u>Id.</u> at 702–03.

---

renewal application for a boarding or kennel license reminds the licensee of periodic inspections, and it contains a statement of consent that must be signed.  Regulations detail the time, place and manner of periodic inspections.  <u>Id.</u>

The Act requires defendant to implement rules and regulations that at least address: (1) the treatment of animals on the premises; (2) required record keeping for any visible symptoms of disease on animals entering and leaving the state; (3) identification of animals; (4) primary enclosures; (5) housing facilities; (6) sanitation; (7) euthanasia; (8) ambient temperatures; (9) feeding; (10) watering; (11) adequate veterinary medical care; (12) inspections, investigations of complaints and training of inspectors and investigators; and (13) record keeping for inspection. K.S.A. § 47-1712(a).

### i.       Substantial Interest

Defendant has established a substantial interest in regulating the dog boarding and training kennel industry.  Again, Kansas dog kennel operators have been subject to the Act since 1991, and domestic animals have been federally regulated since at least 1976.  See 7 U.S.C. § 2131, et seq.; 9 C.F.R. § 1.1 et seq. (federal regulations); 1991 Kansas Laws Ch. 152, § 22.  Congress has recognized a substantial government interest in maintaining humane conditions for dogs and other domestic animals.  S. Rep. 89–1281, at 1 (1966) (Conf. Rep.).  Kansas has also demonstrated such a substantial interest.  See K.S.A. § 21-6412 (criminalizing cruelty to animals which includes keeping animals in inhumane conditions); see also State v. Marsh, 823 P.2d 823, 828 (Kan. Ct. App. 1991) (recognizing Kansas state interest in regulating operation of "puppy mills"); Kerr v. Kimmell, 740 F. Supp. 1525, 1529 (D. Kan. 1990) (state has legitimate interest in "quality control and humane treatment of animals").  Defendant clearly has a substantial interest in regulating the kennel industry.

### ii.       Furthering State Interest

Defendant has established that unannounced warrantless inspections reasonably serve its substantial interest "by ensuring that operators of boarding and training kennels are unable to conceal violations of the Act prior to a routine inspection."  Memorandum In Support Of Motion To Dismiss (Doc. #10) filed January 3, 2023 at 10.  The Supreme Court has explained as follows:

> If inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential.  In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible.

Burger, 482 U.S. at 710 (quoting United States  v. Biswell, 406 U.S. 311, 316 (1972)).

The Kansas legislature promulgated the Act to ensure humane conditions for animals in

kennels—including plaintiffs' boarding and training kennel.  See K.S.A. § 47-1726 ("This act shall license, permit and regulate the conditions of certain premises and facilities within the state of Kansas where animals are maintained, sold or offered or maintained for sale.").  Unannounced, random inspections further defendant's interest in ensuring that training kennel operators comply with the Act.  See Big Cats of Serenity Springs, Inc. v. Rhodes, 843 F.3d 853, 866 (10th Cir. 2016) ("The government has a substantial interest in animal safety and welfare and surprise inspections help further those interests.").  Warrantless administrative searches ensure that defendant's substantial interest in regulating the boarding and training kennel industry is properly achieved.

### iii.   Constitutional Adequacy

The Act adequately defines the scope and limitation of the inspection and puts owners on notice that an official will inspect the licensed facilities pursuant to the Act.  The Supreme Court has explained that the final Burger requirement is satisfied if the statute is "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes."  Burger, 482 U.S. at 703 (quoting Donovan v. Dewey, 452 U.S. 594, 600 (1981)).

The Act expressly puts owners on notice that the "acceptance of a license or permit shall conclusively be deemed to be the consent of the licensee or permittee to the right of entry and inspection of the licensed or permitted premises . . . at reasonable times with the owner or owner's representative present."  K.S.A. § 47-1709(b).  Regulations detail when periodic inspections must or may occur.  See Kan. Admin. Regs. §§ 9-18-9(b), (c).  Specifically, a periodic inspection must occur every 15 to 24 months if the premises passed its three most recent inspections; every nine to 18 months if it passed its two most recent inspections; and every three to 12 months if it failed one of its two most recent inspections.  Kan. Admin. Regs. § 9-18-9(b).  A periodic inspection may

occur if (1) an inspector found a violation in a previous inspection; (2) a person files a complaint; (3) ownership of the premises changed within the previous year; or (4) the operator did not timely renew the license.  Kan. Admin. Regs. § 9-18-9(c).

Finally, regulations properly limit the "time, place and scope" of these inspections.  Burger, 482 U.S. at 710; Kan. Admin. Regs. § 9-18-8 (unless parties agree on different time, inspection must occur between Monday and Friday, between 7:00 A.M. and 7:00 P.M.).  Regulations also specify that during inspections, inspectors may only (1) enter the licensee's place of business; (2) examine required records required; (3) make copies of records; (4) inspect premises and animals as necessary to enforce the Act; (5) document conditions and areas of noncompliance; and (6) use a room, table or other facilities necessary for examination of records and inspection.  Kan. Admin. Regs. § 9-18-8; see also Kan. Admin. Regs. § 9-18-7 (required records).

The Act puts owners on notice that to maintain a license, state officials will periodically inspect their facilities to ensure compliance with the Act.  The Act adequately advises licensees that inspectors are conducting such searches pursuant to law.  Because the Act limits the time, place and scope of the searches, the searches do not offend the Fourth Amendment.  The Court therefore sustains defendant's motion to dismiss Count I.

## II.    Unconstitutional Conditions

In Count II, plaintiffs allege that the Act's compelled consent requirement violates the unconstitutional conditions doctrine because it coerces Johnson to waive his Fourth Amendment rights.  Defendant argues that because the Act does not violate plaintiffs' Fourth Amendment rights, it imposes no unconstitutional conditions.

Under the unconstitutional conditions doctrine, "the government may not require a person to give up a constitutional right in exchange for a discretionary benefit conferred by the

-14-

government where the benefit sought has little or no relationship to the property."  Reedy v. Werholtz, 660 F.3d 1270, 1277 (10th Cir. 2011) (citation omitted).  Because the Court concluded that plaintiffs did not allege a Fourth Amendment violation, consent by licensees is not necessary for periodic inspections, and the requirement that they consent to such inspections "is not the imposition of an unconstitutional condition."  Id. (if no constitutional right jeopardized, cannot sustain claim for unconstitutional conditions).  The Court therefore sustains defendant's motion to dismiss Count II.

## III.    Right To Travel

In Count III, plaintiffs allege that the 30-minute response time provision, designated representative mandate and no-contact penalties violate their fundamental right to travel. Defendant argues that (1) Tenth Circuit precedent forecloses plaintiffs' claim regarding travel within the state of Kansas and (2) the Act does not substantially interfere with plaintiffs' right to travel between states.

### A.    Intrastate Travel

Plaintiffs allege that the Act prevents them from traveling to various cities in Kansas because they must respond to an inspector's notice within 30 minutes or risk a no-contact fee. Complaint For Declaratory Judgment And Injunctive Relief (Doc. #1) filed October 21, 2022 ¶ 120.  The Tenth Circuit has "concluded that the fundamental right to freedom of movement applies only to interstate travel."  McCraw v. City of Okla. City, 973 F.3d 1057, 1081 (10th Cir. 2020) (internal quotation marks omitted) (quoting D.L. v. Unified Sch. Dist. No. 497, 596 F.3d 768, 776 (10th Cir. 2010)).  Accordingly, the challenged law need only be rationally related a

legitimate government interest.  Id.[4]

As discussed above, defendant has established that unannounced, periodic inspections of boarding and training kennels further its interest in protecting domestic animals from cruel and inhumane conditions.  The 30-minute response time provision and no-contact penalties are rationally related to this substantial interest because they ensure that licensees will respond to inspectors.  The Court therefore sustains defendant's motion to dismiss plaintiffs' claim that the Act unconstitutionally burdens their non-fundamental right to intrastate travel.

### B.      Interstate Travel

Plaintiffs allege that the 30-minute response time provision, the no-contact penalties and designated representative mandate impede their ability to travel freely and together.  Defendant argues that plaintiffs' interstate travel claim fails because the challenged regulations do not directly or substantially interfere with their right to travel.

The freedom to travel throughout the United States "has long been recognized as a basic right under the Constitution."  Dunn v. Blumstein, 405 U.S. 330, 338 (1972).  State action violates the right to enter and leave a state when a citizen's ability to travel from one state to another is inhibited "by statutes, rules, or regulations which unreasonably burden or restrict movement." Saenz v. Roe, 526 U.S. 489, 499 (1999).   The textual source of this right has been the subject of some debate and has not been definitively identified by the Supreme Court.  Abdi v. Wray, 942 F.3d 1019, 1029 (10th Cir. 2019) (citing Saenz v. Roe, 526 U.S. 489, 500–01 (1999)).  The Tenth Circuit has analyzed the right under a substantive-due-process framework and found that the right

---

[4]      Plaintiffs argue that the Tenth Circuit incorrectly decided D.L. and McCraw and that neither case squarely addressed the issues in this case.  The Court disagrees.  The law under Tenth Circuit precedent is clear and binding on this circuit.  The Court rejects plaintiffs' invitation to go against binding precedent and recognize a fundamental right to intrastate travel.

to travel interstate is a fundamental right, infringement of which is  subject to strict scrutiny.  See id. at 1026–30.[5]  Government conduct that does not "directly and substantially impair" the right to free interstate movement does not amount to a constitutional violation.  Id. at 1030.

The right to interstate travel is "largely limited to embodying a right to be free of state-created impediments that directly restrain or burden an individual's ability to travel across state lines."  Grider v. City & Cnty. of Denver, No. 10-CV-00722-MSK-MJW, 2012 WL 1079466, at *7 (D. Colo. Mar. 30, 2012).  In Crandall v. State of Nevada, 73 U.S. 35 (1867), for example, the Supreme Court invalidated a state departure tax on those leaving the state, and in Edwards v. California, 314 U.S. 160 (1941), the Court invalidated a state criminal statute that prohibited transportation of indigents into the state.  Accordingly, the right to interstate travel prohibits burdens which activate upon the traveler's crossing of a state boundary, a situation that plaintiffs have not alleged.

Relying on Aptheker v. Secretary of State, 378 U.S. 500 (1964), plaintiffs argue that to travel, the designated representative mandate impermissibly requires them to sacrifice other constitutional rights.  Specifically, to designate a representative, plaintiffs must "grant that person unfettered access to their property, their records, and their animals under their care" and "cede control and decision-making powers to that person during the search process."  Plaintiffs' Opposition To Defendant's Motion To Dismiss (Doc. #13) filed January 24, 2023 at 13.  In Aptheker, the Supreme Court concluded that a law which prohibited issuing a passport to members

---

[5]     Plaintiffs argue that defendant's motion addresses only their Due Process right to travel claim and not address their Privileges or Immunities Claim.  Plaintiff's attempt to circumvent defendant's motion to dismiss is unconvincing.  Defendant clearly argued that under the appropriate legal standards, plaintiffs failed to allege a plausible right to interstate travel claim.  See Memorandum In Support Of Motion To Dismiss (Doc. #10) filed January 3, 2023 at 14–15.  Nevertheless, the Tenth Circuit analyzes fundamental right to travel claims under a due process framework.  See Abdi, 942 F.3d at 1026–30.

of any "Communist organization" violated the right to travel.  378 U.S. at 507.   In rejecting the government's argument that a member "could recapture his freedom to travel by . . . abandoning his membership in the organization," the Court emphasized that the "freedom of association is itself guaranteed in the First Amendment [and] restrictions imposed upon the right to travel cannot be dismissed by asserting that the right to travel could be fully exercised if the individual would first yield up his membership in a given association."  Id.  The Court emphasized, however, that the restriction at issue was "severe . . . and in effect a prohibition against, world-wide foreign travel."  Id.  Here, the designated representative mandate does not prohibit interstate travel or even severely restrict such travel.  Aptheker is not instructive here.

Plaintiffs allege that the designated representative mandate directly and substantially impairs their fundamental right to travel but do not allege sufficient factual matter to state a plausible claim.  Such conclusory allegations are insufficient for the Court to infer more than the mere possibility of misconduct by defendant.  Importantly, the Act does not limit the number of representatives plaintiffs may designate.  Kan. Admin. Regs. § 9-18-9(3).   In fact, by permitting the designation of unlimited representatives, the regulation facilitates unfettered travel for licensees.  Similarly, as to the 30-minute response time window and no-contact penalties, plaintiffs complaint alleges that the restrictions impede their ability to travel freely and together.  Plaintiffs allege that they do not want to designate additional representatives, restrict themselves from travel 30 minutes from CFK facilities, or risk penalties. These restrictions, however, do not directly restrain or burden plaintiffs' ability to travel across state lines.

Because plaintiffs have not sufficiently alleged that the 30-minute response time provision, no-contact penalties and designated representative mandate directly and substantially impair their right to travel, the Court sustains defendant's motion to dismiss Count III.

-18-

**IT IS THERFORE ORDERED** that defendant's <u>Motion To Dismiss</u> (Doc. #9) filed

January 3, 2023 is hereby **SUSTAINED.** All counts are dismissed.

Dated this 5th day of May, 2023 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge