## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SCOTT JOHNSON, HARLENE HOYT and COVEY FIND KENNEL, LLC | ) ) ) | |
| Plaintiffs, | ) ) ) | CIVIL ACTION |
| v. | ) ) | No. 22-1243-KHV |
| JUSTIN SMITH, D.V.M., in his official capacity as Animal Health Commissioner at the Kansas Department of Agriculture, | ) ) ) ) | |
| Defendant. | ) ) ) | |

### MEMORANDUM AND ORDER

Scott Johnson, Harlene Hoyt and Covey Find Kennel, LLC bring suit for declaratory and injunctive relief against Justin Smith in his official capacity as the Kansas Animal Health Commissioner. See Complaint For Declaratory Judgment And Injunctive Relief (Doc. #1) filed October 21, 2022. Plaintiffs allege that (1) the Kansas Pet Animal Act, K.S.A. § 47-1701 et seq., authorizes unreasonable, warrantless searches in violation of the Fourth Amendment to the United States Constitution and (2) because the warrantless searches violate the Fourth Amendment, conditioning the mandatory annual license renewal on a Fourth Amendment waiver violates the unconstitutional conditions doctrine. Pretrial Order (Doc. #81) filed January 21, 2025 at 17–18.

On May 27, 2025, the Court held a bench trial on plaintiffs' Fourth Amendment claims.[1] After careful consideration, based on largely stipulated facts, the Court makes the following findings of fact and conclusions of law, as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure. For reasons set forth below, the Court finds in favor of plaintiffs on both counts.

---

[1] The Court construes the briefing on the parties' cross-motions for summary judgment as trial briefs. Order (Doc. #113) filed April 2, 2025.

**Findings Of Fact**

**I.    The Kansas Pet Animal Act**

In 1972, the Kansas legislature enacted the Kansas Pet Animal Act ("KPAA"), K.S.A. § 47-1701 et seq., which regulates animal dealers, pet shop operators, pounds, animal shelters and research facilities.  In 1991, Kansas began regulating boarding kennels and in 1996, training kennels.  It distinguished boarding and training kennels from other categories because boarding and training kennels house animals owned and claimed by others.  Both the Kansas Attorney General's Office and the Kansas Livestock Commissioner (predecessor to the Animal Health Commissioner) opposed regulating boarding kennels, claiming no demonstrated need for such regulations.  Training, handling and kenneling dogs is not intrinsically or inherently dangerous.

This case only involves boarding and training kennels, and not other animal facilities under the KPAA.  Justin Smith is the current Animal Health Commissioner for the Kansas Department of Agriculture.  The Animal Health Commissioner is the Chief Administrative Officer of the Division of Animal Health, which oversees, implements and enforces the Animal Facilities Inspection ("AFI") Program.

Since 2022, Sasha Thomason—a licensed veterinarian with a master's degree in public health training—has worked as the AFI Program Director.  Thomason worked as a small animal consultant veterinarian for two years before becoming director and before that, as a small animal emergency medical veterinarian for 17 years.  As pet owners have increasingly equated their pets with their children, Thomason has seen a growing number of boarding and training kennels.  For example, in March of 2022, Kansas had 189 licensed boarding or training kennels.  By September of 2024, that number had grown to 214.  Thomason oversees the day-to-day operations of the AFI Program, which includes routine inspections of licensed boarding and training kennels.  Thomason

reports to Smith.

Today, the KPAA regulates individuals who operate boarding and training kennels.[2]  The KPAA defines a "boarding or training kennel operator" as "any person who operates an establishment where four or more dogs or cats, or both, are maintained in any one week during the license year for boarding, training or similar purposes for a fee or compensation."  K.S.A. § 47-1701(p).  To operate a boarding or training kennel, the KPAA requires that anyone other than a licensed veterinarian obtain a license.

A.    The License Process

Section 47-1709(a) of the KPAA governs applications for an original license or permit.  The statute states as follows:

> The commissioner or the commissioner's authorized, trained representatives shall make an inspection of the premises for which an application for an original license or permit is made under K.S.A. 47-1701 et seq., and amendments thereto, before issuance of such license or permit. No license or permit shall be issued by the commissioner to an applicant described in this subsection until the premises for which application is made has passed a licensing or permitting inspection. *The application for a license shall conclusively be deemed to be the consent of the applicant to the right of entry and inspection of the premises sought to be licensed or permitted by the commissioner or the commissioner's authorized, trained representatives at reasonable times with the owner or owner's representative present. Refusal of such entry and inspection shall be grounds for denial of the license or permit. Notice need not be given to any person prior to inspection.*

K.S.A. § 47-1709(a) (emphasis added).  Under the statute, a boarding or training kennel operator first applies for a license.  An AFI program investigator then inspects the premises.  By applying for a license, the operator consents to an inspector entering the property and conducting an

---

[2]    In total, the KPAA sets forth the following categories of facilities that the Animal Facilities Inspection program licenses and inspects: boarding and training kennels, animal distributors, pet shop operators, pounds, animal shelters, hobby breeders, research facilities, animal breeders and retail breeders.

inspection.[3]  If an applicant refuses the initial inspection, the license is denied.  Notice need not be

given before inspection.  Id.  Annually, operators must apply to renew their licenses.  By accepting

a license, the operator consents to an inspector entering its property and conducting an inspection.

Operating a boarding or training kennel without a license is a Class A nonperson misdemeanor.

B.    Consent To Routine Inspections

Once the state issues a license, officials conduct periodic inspections of the premises.

Section 47-1709(b) governs these routine inspections.  It states as follows:

> The commissioner or the commissioner's authorized, trained representatives may
> inspect each premises for which a license or permit has been issued under
> K.S.A. 47-1701 et seq., and amendments thereto.  *The acceptance of a license or
> permit shall conclusively be deemed to be the consent of the licensee or permittee
> to the right of entry and inspection of the licensed or permitted premises by the
> commissioner or the commissioner's authorized, trained representatives at
> reasonable times with the owner or owner's representative present.  Refusal of such
> entry and inspection shall be grounds for suspension or revocation of the license
> or permit.  Notice shall not be given to any person prior to inspection.*

K.S.A. § 47-1709(b) (emphasis added).  The purposes of inspections are to (1) keep licensees in

compliance with the KPAA, which in turn prevents harm to the animals, and (2) educate licensees

on compliance with the relevant regulations.  The purpose is not to diagnose disease or check the

health of animals.

AFI program officials are responsible for conducting routine inspections.[4]  Before 2018,

the KPAA required inspectors to provide advance notice of inspections.  Now, however, under

---

[3]    Plaintiffs do not challenge defendant's ability to conduct warrantless inspections
before issuance of original licenses under K.S.A. § 47-1709(a).  See Joint Supplement To
Submission Regarding Statutes And Regulations That Plaintiffs Challenge As Unconstitutional
And Proposed Injunction Language If Plaintiffs Prevail (Doc. #130) filed June 5, 2025.

[4]    The AFI program currently employs three inspectors: Christopher Demel, Sara
Washee and Ben Lancaster.

Section 47-1709(b), inspectors "shall not" give notice to the licensee. Id. Inspectors do not need a warrant to enter and inspect the licensed facilities. When conducting an inspection, AFI inspectors can inspect any area that the licensee uses as part of the licensed facility, which can include the home, anywhere animals are kept, each building that houses animals, food or cleaning chemicals, kitchens and pantries, sheds, wherever records are kept, kennels and the entire property of the licensee under which the activity falls.

The inspections occur "at reasonable times, with the owner or owner's representative present." Id. By regulation, an official must conduct a periodic inspection of the premises every 15 to 24 months if the premises passed its three most recent inspections, every nine to 18 months if it passed its two most recent inspections and every three to 12 months if it failed one of its two most recent inspections. An inspector may also conduct an inspection if (1) he or she found a violation in a previous inspection; (2) a person files a complaint; (3) ownership of the premises has changed within the previous year; or (4) the operator did not timely renew the license.

Unless the parties agree on a different time, an inspection must occur between Monday and Friday, between 7:00 A.M. and 7:00 P.M. The license form allows a licensee to specify preferred hours. If the owner of the premises is unavailable during these times, the owner must designate in writing a representative who can be present during an inspection.

If a licensee or designated representative is not available for inspection within 30 minutes of the inspector's arrival, the state considers it a "no-contact" event, imposes a $200 no-contact fee and returns to the premises at a later date. If a licensee asks the inspector to come back at a more convenient time, this is also considered a "no-contact" event. If the licensee refuses inspection, an official may obtain an administrative warrant to search the premises and the state may suspend or revoke the license. Since 2012, when the legislature added the administrative

warrant provision, the AFI program has not sought, received or used an administrative warrant for a routine inspection. Since 2018, no boarding or training kennel operator has refused entry for a routine inspection. Refusing a warrantless search is prohibited, constitutes a crime and results in mandatory penalties.

In addition to inspections by AFI officials, the KPAA also requires a veterinarian to inspect the kennels annually, and the kennels must operate under a veterinary medical care plan.[5] The veterinarian inspection is to ensure that the facility is adequate to properly control disease spread. Veterinarians review and modify a facility's cleaning and disinfection protocols, external and internal parasite control methods and vaccination protocols.

C.    The Policy And Procedure Manual

The AFI Program Director drafts a Policy and Procedure Manual that provides guidance and direction for the AFI program. The AFI program does not provide the Manual to licensees.

The Manual gives inspectors a non-exhaustive list of potential violations, examples of violations and instructions for how to determine whether a violation exists, called the "Line-Item Quick Reference Guide." When completing the inspection, the inspectors have a "clipboard inspection checklist," which is essentially a condensed version of the "Line-Item Quick Reference Guide." The checklist contains 37 line items, which are different violations that the inspector can cite under the KPAA. Line items include evaluation of surfaces, shelter, maintenance, sanitation, drainage, water and electric, waste disposal, food and bedding storage, cleaning, pest control, exercise, records, tethering, feeding, watering, heating and cooling and more. For example, under the bedding storage line item, inspectors determine whether licensees are storing bedding in a

_____

[5]    Plaintiffs do not challenge the KPAA's licensing requirement that annually, a veterinarian must conduct an on-site visit.

waterproof container with a tight fitting lid. If an operator does not properly store bedding, mice can get into the bedding and defecate, which can increase the risk of disease spread among animals and also from animals to humans.

Mice feces can cause various infections, including leptospirosis, salmonella, campylobacter and hantavirus. Leptospirosis is a spirochete bacteria which is very common in Kansas. It can cause acute kidney failure in dogs and humans. The risk of an animal transmitting leptospirosis to a human is very low, however, because a human would have to ingest the animal's urine to get it. The KPAA does not require that licensees wash their hands with soap and water, which would prevent such transmission. Leptospirosis can be prevented by vaccination, which the licensee and veterinarian could require in the facility's veterinary care form.

Hantavirus is an aerosol virus, which is typically transmitted during sweeping or brushing animals. It is more of a human disease and is rare in cats and dogs. Transmission could be prevented by wearing a mask during these activities. The KPAA, however, does not require licensees to wear a mask.

Salmonella and campylobacter can cause severe gastrointestinal symptoms, including vomiting and diarrhea, which can lead to dehydration in both humans and dogs. Salmonella, campylobacter and hantavirus cannot be prevented by vaccination.

Contact with animal feces, as compared to mice feces, is the most common method of disease transmission for the following zoonotic[6] diseases: campylobacter, salmonella, giardia and leptospirosis. The transmission risk of giardia is very low; indeed, the type of giardia that makes humans sick is different from that which makes dogs and cats sick. If ingested, animal feces may

---

[6]    Zoonotic diseases are those transmitted from animal to human.

also cause coccidia, a protozoa parasite. Dogs cannot infect other dogs with coccidia, and humans are not susceptible to it.

Inspectors do not diagnose, test or treat disease in animals. Also, inspectors do not test food or water for contamination. If a disease outbreak does occur at a facility, the licensee is encouraged to contact his or her veterinarian, not the AFI program. In such circumstances, Smith may issue quarantine orders, separate and apart from the KPAA. The AFI program does not handle matters of public health, which it refers to the Kansas Department of Health and Environment, or criminal matters, which it refers to local law enforcement.

D.    Inspection Violations

Even if an inspector provided more than 30 minutes notice of an inspection, a licensee could not quickly remedy chronic or severe violations at a boarding or training kennel. For example, an operator could not easily remedy or conceal violations of animal well-being. Specifically, dog bites, dehydration, sores or ulcers, matted fur, grooming issues, dental disease, dirty ears and the like cannot be remedied in a short amount of time. Similarly, an operator could not fix water and electric, heating and cooling, structural (i.e. rotten posts, leaking roofs, rust), drainage or cleanliness issues with 30 minutes. Some violations could be easily remedied with 30 minutes notice, including replacing a chewed-up dog bowl or moving animals for compatibility or temperature issues. Inspectors are quickly able to determine the cleanliness of a facility, general health of the animals and whether the facility has a spacing issue.

The Manual groups violations in three categories—A, B and C—with A being least serious and C being most serious. Violations are also assigned a severity level between 1 and 5, with 5 being the most severe. The inspector determines the severity level based on the number of animals impacted by the violation.

The inspection process typically lasts between one and two hours.  To determine the final inspection result, the inspector tallies the number of violations and their severity.  The licensee passes the inspection if he or she has four or fewer level A violations, or some level B violations, as long as the point total is four or less.  The licensee fails the inspection if he or she receives five points. When a facility fails an inspection, the AFI program will usually re-inspect it within 30 days, but possibly within ten to 14 days depending on the severity of the violations.

## II.    Procedural History

On October 21, 2022, plaintiffs filed suit, alleging that the KPAA violates their Fourth Amendment rights and fundamental right to travel.[7]  See Complaint For Declaratory Judgment And Injunctive Relief (Doc. #1).    On May 5, 2023, the Court dismissed all claims.    See Memorandum And Order (Doc. #38).  Plaintiffs appealed.  See Notice Of Appeal (Doc. #40) filed May 19, 2023.    The Tenth Circuit affirmed the dismissal of plaintiffs' right-to-travel claim (Count III).  See Johnson v. Smith, 104 F.4th 153, 155 (10th Cir. 2024).  It reversed the dismissal of plaintiffs' Fourth Amendment claims (Counts I and II) and remanded the case for further proceedings to determine (1) whether Johnson's business is closely regulated and (2) if so, whether warrantless inspections are reasonable under the Fourth Amendment.  See id.

On February 28, 2025, the parties filed cross-motions for summary judgment, which the Court overruled and now construes as trial briefs.  See Order (Doc. #113).  On May 27, 2025, as

---

[7]      Plaintiffs are Scott Johnson, Harlene Hoyt and Covey Find Kennel, LLC.  Johnson owns and operates Covey Find Kennel, LLC.  Johnson and Hoyt jointly own the land on which the Covey Find Kennel facilities sit.  Johnson is an award-winning and nationally respected professional dog trainer and handler.  As defined by statute, he is a training kennel operator, and he holds a boarding or training kennel operator license.  Johnson has held a license to operate the facility since 1999.  Because plaintiffs bring a facial challenge to the KPAA's warrantless search and licensing regime, the Court need not consider Johnson's individual circumstances.

noted, the Court held a bench trial on plaintiffs' Fourth Amendment claims.

## Conclusions Of Law

Count I alleges that by authorizing warrantless searches of boarding and training kennels, K.S.A. § 47-1709(b) violates plaintiffs' Fourth Amendment rights to be free of unreasonable, warrantless searches.  Count II alleges that the compelled consent requirement in K.S.A. § 47-1709(b) coerces plaintiffs to waive their Fourth Amendment rights in exchange for a license and therefore violates the unconstitutional conditions doctrine.  Defendant argues that warrantless searches under the KPAA fall into the closely regulated industry exception to the Fourth Amendment's warrant requirement and are therefore constitutional.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The Fourth Amendment protects the privacy and security of individuals against arbitrary invasions by the government.  New Jersey v. T.L.O., 469 U.S. 325, 335 (1985).  The Fourth Amendment only proscribes searches that are unreasonable.  Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989).  A search of property is "presumptively unreasonable apart from the authority of a search warrant or an exception approved by the Supreme Court."  Cuervo v. Sorenson, 112 F.4th 1307, 1315 (10th Cir. 2024).

Here, the parties do not dispute that under the KPAA, defendant conducts warrantless searches of boarding and training kennels.  Thus, under the Fourth Amendment, defendant's actions are presumptively unreasonable unless an exception to the warrant requirement applies.  Defendant invokes the "closely regulated industry" exception.  See New York v. Burger, 482 U.S.

691, 702 (1987). The Court therefore addresses the threshold issue whether boarding and training kennels are a closely regulated industry.[8]

## I.     Whether Boarding And Training Kennels Are A Closely Regulated Industry

As noted, defendant asserts that warrantless inspections are reasonable and therefore constitutional because boarding and training kennels are closely regulated.

The expectation of privacy is particularly low for the narrow class of heavily or "closely regulated" businesses because the business owner has voluntarily decided to "subject himself to a full arsenal of governmental regulation." Marshall v. Barlow's, Inc., 436 U.S. 307, 313 (1978). "Without elaborate enforcement schemes, the regulation of those industries would be ineffective." Big Cats of Serenity Springs, Inc. v. Rhodes, 843 F.3d 853, 865 (10th Cir. 2016). The Supreme Court has emphasized that these "industries have such a history of government oversight that no reasonable expectation of privacy [can] exist for a proprietor over the stock of such an enterprise." Burger, 482 U.S. at 699 (quoting Marshall, 436 U.S. at 313).

This exception is narrow. City of Los Angeles, Calif. v. Patel, 576 U.S. 409, 424 (2015). Over the past 50 years, the Supreme Court has only identified four industries which fall into it: liquor sales, firearms dealings, mining and automobile junkyards. Id. To determine whether an industry is closely regulated, the Court considers "the history of warrantless inspections in the industry, the extensiveness and intrusiveness of the regulatory scheme, whether other jurisdictions impose similar regulatory schemes, and whether the industry would pose a threat to the public welfare if left unregulated." Johnson, 104 F.4th at 167 (internal quotations omitted).

---

[8]     The Tenth Circuit has defined the relevant industry as "boarding or training kennels." Johnson, 104 F.4th at 169.

A.    History Of Warrantless Inspections

Under the first factor, the Court considers "the duration of a particular regulatory scheme." Burger, 482 U.S. at 701.  For example, in finding that the liquor industry is closely regulated, the Supreme Court noted that England first passed liquor legislation in 1770, Massachusetts had a similar regulation in 1692 and in 1791, Congress enacted a federal law allowing officers to inspect distilling premises without a warrant.  Colonnade Catering Corp. v. United States, 397 U.S. 72, 75 (1970).  In Burger, the Supreme Court noted that warrantless inspections of junk shops had existed for at least 140 years—today, just 180 years.  Burger, 482 U.S. at 707.  To rely solely on length of regulation, however, would ignore "new and emerging industries."  Donovan v. Dewey, 452 U.S. 594, 606 (1981).  Accordingly, for cases dealing with "new or emerging industries," such as nuclear power, which "pose enormous potential safety and health problems," history is less important.  Id.; see Johnson, 104 F.4th at 170.

Here, the Kansas legislature began regulating boarding or training kennels and conducting warrantless searches in 1991, approximately 34 years ago.  Compared to the history associated with industries which the Supreme Court has found to be closely regulated, the history in this case is relatively inconsequential.  See Johnson, 104 F.4th at 170 (33 years not "entitled to particular weight").  To combat this, defendant claims that boarding and training kennels are a new and emerging industry which pose health and safety problems if left unregulated.  In support, defendant points to Thomason's testimony that during her tenure as a veterinarian, she has seen the number of boarding or training kennels grow, as pet owners increasingly equate their pets with their children.  Even so, the relevant inquiry is whether the industry was new and emerging in 1991, not in recent times.  See id. ("nothing in the complaint provides reason to think that the boarding- or training-kennel industry was either new or emerging *in 1991*" (emphasis added)).  The record lacks

-12-

any evidence to this effect. Moreover, as discussed under the fourth factor, defendant has not proven that the industry poses "enormous potential safety and health problems," such that the Court should give the history of regulation less weight. Donovan, 452 U.S. at 606. This factor weighs against finding that boarding and training kennels are a closely regulated industry.

        B.     Extensiveness And Intrusiveness Of The Regulatory Scheme

The Court also considers the extensiveness and intrusiveness of the regulatory scheme. "[T]he number of regulations certainly is a factor in the determination whether a particular business is closely regulated," but "the sheer quantity of pages of statutory material is not dispositive." Burger, 482 U.S. at 705 n.16. A "hodgepodge" of general regulations, such as requirements that businesses "maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards" do not "establish a comprehensive scheme of regulation that distinguishes [one industry] from numerous other businesses." Patel, 576 U.S. at 425.

In this case, Kansas employs a comprehensive scheme to regulate boarding and training kennels, including regulations on housing, cleaning, sanitization, pest control, feeding and watering, veterinary care and more. The regulations are directed at such a narrow subset of businesses—boarding and training kennels—that the regulations are easily distinguished from those on other businesses in the state. This factor therefore weighs in favor of finding that boarding and training kennels are a closely regulated industry.

        C.     Whether Other Jurisdictions Impose Similar Regulatory Schemes

The government, however, "must show more than just that it has imposed extensive regulations targeting a specific class of businesses." Johnson, 104 F.4th at 171. Rather, the question is "whether the existence of the regulations governing training or boarding kennels clearly inform those in the industry that they will be subject to unannounced warrantless inspections." Id.

To answer that, the Court finds guidance in the laws of other jurisdictions.  Id.

Under the third factor, "[a]n industry is more likely to be considered closely regulated if the federal government or the great majority of States have adopted similar inspection regimes." Id.  On appeal, the Tenth Circuit closely reviewed the federal Animal Welfare Act and completed a comprehensive survey of relevant statutes in all 50 states.  It found that while the federal Act has expanded over time, "it has never imposed requirements on boarding or training kennels" and therefore could hardly warn business owners that their property is subject to warrantless searches. Id. at 172.  As for state regulation, it concluded that 34 states have regulatory schemes targeting pet-animal businesses.  Id.  Of those, nine states subject boarding or training kennel operators to unannounced warrantless inspections.  Id.

The parties do not present new evidence on this element or dispute the Tenth Circuit survey of relevant law.  The fact that nine states—less than a fifth of states—impose similar regulations on boarding and training kennels suggests that operators are not on notice that their property is subject to unannounced warrantless inspections.  Id. (citing Burger, 482 U.S. at 705 (38 similar state statutes)).  This factor weighs against finding that that boarding or training kennels are a closely regulated industry.

D.    Whether The Industry Would Pose A Threat To The Public Welfare[9]

For the final factor, the Court considers the danger presented by the industry.  As the Supreme Court noted in Patel, every industry which it has found to be closely regulated was one which "poses a clear and significant risk to the public welfare."  Patel, 576 U.S. at 424.  As noted

---

[9]    After the Tenth Circuit mandate, defendant recruited Thomason to testify as an expert on whether the industry would pose a threat to the public welfare if left unregulated.  The Court sustained plaintiffs' motion to strike or exclude this expert opinion testimony, and at trial, limited her testimony to facts within her personal knowledge.

even new and emerging industries may be considered closely regulated if they "pose enormous potential safety and health problems." Dewey, 452 U.S. at 606. "The rationale for considering the dangerousness of an industry to support or reject its characterization as closely regulated would seem to be that in determining whether a business owner can reasonably expect privacy, those who engage in dangerous activities can more likely expect to be subject to intrusive regulation and inspection." Johnson, 104 F.4th at 166.

Here, defendant concedes that operating a boarding or training kennel is not an intrinsically or inherently dangerous activity. Even so, it argues that if unregulated, boarding and training kennels pose a risk of animal neglect, animal injury and spread of diseases to pets and their owners. Defendant, however, shows no correlation between the supposed risks and failed inspections. Inspectors do not diagnose disease in animals, test animals for contagious or non-contagious diseases, treat animals or test food or water for contamination. Also, certain disease risks pose a low risk to humans or can be prevented by vaccination—risks on which the licensee would work with a veterinarian, not the AFI program.

If a disease outbreak does occur, the licensee and its veterinarian are responsible for responding, not the AFI program. The Kansas Department of Health and Environment handles matters of public health, and local law enforcement handles criminal matters. Even the legislative history of the KPAA shows that the Attorney General and the Livestock Commissioner thought that regulation of boarding kennels was not necessary. Defendant's concerns could essentially turn any industry into a closely regulated one and swallow the rule. Patel, 576 U.S. at 425. This factor weighs against finding that that boarding and training kennels are closely regulated.

Historically, boarding and training kennels have not been closely regulated or regulated by a large number of other jurisdictions, and defendant has not shown that the industry poses a risk

to the general welfare if not closely regulated. The Court therefore finds that boarding and training kennels are not a closely regulated industry, and that as a result, defendant has not overcome the presumption that warrantless searches of boarding and training kennels are unreasonable.

## II. Whether The Three **Burger** Criteria Are Satisfied

Even if boarding and training kennels were a closely regulated industry, defendant has not met its burden of showing that warrantless inspections are reasonable. Under Burger, the state must establish that (1) it has a substantial interest in regulating boarding and training kennels; (2) warrantless searches will further that interest; and (3) the inspection program provides a constitutionally adequate substitute for a warrant. See Burger, 482 U.S. at 702–03.

### A. Constitutional Adequacy

The Court first addresses the constitutional adequacy of the inspection program. Defendant satisfies this Burger requirement by showing that the statute is "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." Burger, 482 U.S. at 703. Under this factor, the Court looks at the government's inspection program "in terms of the certainty and regularity of its application." Id. The KPAA must limit the discretion of an inspecting officer by being "carefully limited in time, place, and scope." Id. at 702. Searches that are "so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials" cannot satisfy this element. Dewey, 452 U.S. at 599.

Here, the statute specifies that inspections occur "at reasonable times." K.S.A. § 47-1709(b). Regulations clarify that inspections occur every 15 to 24 months if the premises passed its three most recent inspections, every nine to 18 months if it passed its two most recent

-16-

inspections and every three to 12 months if it failed one of its two most recent inspections.   A periodic inspection may occur if (1) an inspector found a violation in a previous inspection; (2) a person files a complaint; (3) ownership of the premises changed within the previous year; or (4) the operator did not timely renew the license.   Unless the parties agree on a different time, an inspection must occur between Monday and Friday, between 7:00 A.M. and 7:00 P.M.   Licensees may also identify their preferred hours.   The regulations also specify that during inspections, inspectors may inspect any area that the licensee uses as part of the licensed facility, which can include the home, anywhere animals are kept, each building that houses animals, food or cleaning chemicals, kitchens and pantries, sheds, wherever records are kept, kennels and the entire property of the licensee that the activity falls under.   For these reasons, the KPAA is sufficiently comprehensive and defined that licensees cannot help but be aware that their property will be subject to periodic inspections undertaken for specific purposes.[10]

B.    Substantial Government Interest

Defendant argues that it has a substantial interest in using warrantless searches to (1) protect animals against abuse and neglect and (2) prevent the spread of disease among animals and from animals to humans.

Defendant must establish "a substantial interest in enacting the regulations" which authorize warrantless searches.  Johnson, 104 F.4th at 175.  It must show that boarding and training kennels "are a significant contributor" to animal abuse, animal neglect and the spread of disease, and "that it was reasonable to think that regulating them" through warrantless searches would

---

[10]    In a footnote, the Tenth Circuit determined that the KPAA "advises businesses when searches are made pursuant to law and are within the proper scope" and "it limits officers' discretion over executing searches at least as much as the search provision that was upheld in Burger" and Dewey.  Johnson, 104 F.4th at 174 n.7.

reduce those concerns. Id. (discussing Burger, 482 U.S. at 708–09). "[C]oncern for animal welfare is not enough" for defendant to meet its burden. Id. Defendant must proffer "evidence establishing a real need" to regulate boarding and training kennels through warrantless searches. Id. Here, defendant has not done so.

First, the real need must have existed at the time the Kansas legislature enacted the regulations. Id. at 175 ("a substantial interest in *enacting* the regulations") (emphasis added). At the time, both the Kansas Attorney General's Office and the Kansas Livestock Commissioner opposed regulation of boarding kennels, claiming no demonstrated need for such regulations. Second, training, handling and kenneling dogs is not intrinsically or inherently dangerous, and as noted, defendant has not shown that if left unregulated by warrantless searches, boarding and training kennels pose a clear and significant risk to public welfare. Defendant has therefore not shown a "real need" for warrantless searches. Third, because boarding and training kennels house animals owned or claimed by others, pet owners themselves have a strong motive to ensure the health and safety of their pets. See id. at 169 (animal owners "have a much stronger, and more personal, interest than any government inspector"). For that reason, pet owners already hold licensees accountable, lessening the government's need to protect the animals through warrantless searches. While defendant's goals are laudable, defendant has not shown that boarding and training kennels pose a substantial risk of abuse, neglect or disease, given the fact that the kennels are not inherently dangerous, and the market (through pet owners) is inherently self-policing.

C.    Furthering The Interest

To satisfy this element, defendant must show that warrantless, unannounced inspections are "necessary" to further the state's interests in (1) protecting animals against abuse and neglect and (2) preventing the spread of disease among animals and from animals to humans. See Burger,

482 U.S. at 702. Defendant argues that if it gave licensees notice of inspections, they could remedy potential violations, which would frustrate the purpose of the inspection regime. He asserts that the current regime keeps licensees "on their toes" and in compliance with the KPAA. The Court disagrees for several reasons.

First, the legislative history of the KPAA demonstrates that regulation is not necessary. As noted, both the Kansas Attorney General's Office and the Kansas Livestock Commissioner (predecessor to the Animal Health Commissioner) opposed regulating boarding kennels, claiming no demonstrated need for such regulations.

Second, as to the state's interest in preventing the spread of disease, inspectors do not diagnose, test or treat animals for disease. AFI program inspections are cumulative because boarding and training kennels are already inspected on an annual basis by veterinarians and operate under veterinary care plans. If a disease outbreak does occur, the licensee and his or her veterinarian are responsible for responding, not the AFI program. Moreover, the Kansas Department of Health and Environment handles matters of public health related to the spread of disease.

Third, a licensee cannot quickly remedy or conceal chronic or severe violations, so surprise inspections are not necessary to catch these violations. As noted, an operator could not with 30 minutes notice easily remedy or conceal violations of animal well-being or fix water and electric, heating and cooling, structural, drainage or cleanliness issues. The Court acknowledges that some violations could be easily remedied with 30 minutes notice, including replacing a chewed-up dog bowl or moving animals for compatibility or temperature issues. Even so, the KPAA already provides a 30-minute notice window before the event is considered "no contact," and during that time, an operator could fix the same violations.

Fourth, the KPAA authorizes an administrative search warrant if a licensee refuses inspection.  Since 2012, the government has had the ability to use administrative warrants to search a licensed facility.  It has never invoked that authority.  Defendant claims that it has not done so because no licensee has refused an inspection, thus demonstrating that the current regime works.  Moreover, it claims that under the current statutory scheme, an administrative warrant would remove the element of surprise because the inspector would show up to the facility for an inspection, the licensee would refuse inspection and once the inspector left to obtain a warrant, the licensee could remedy any violations.  If compliance is the goal, however, an administrative warrant would further that interest because—as defendant concedes—a licensee would remedy violations with notice.  An inspector can obtain an administrative warrant in 30 minutes or less— the same time that a licensee has before a warrantless inspection becomes a "no-contact" event under the current scheme.  See Supplemental Joint Stipulations Of Facts (Doc. #125) filed May 19, 2025, ¶ 248 ("In Kansas, it can take 15 minutes or less to secure a search warrant.").  In that time, licensees can cure problems that are easily curable, ensuring compliance with the KPAA, protecting animals and preventing the spread of disease.  To the extent defendant might contend that such a process would place an administrative burden on the AFI program and the courts, the record is devoid of any evidence to that effect.[11]  For each of these reasons, defendant has not established that warrantless, unannounced searches are necessary to further any substantial interest in protecting animals against abuse and neglect and preventing the spread of disease among animals and from animals to humans.

---

[11]    To obtain an administrative search warrant, the Animal Health Commissioner applies "to any court of competent jurisdiction," and upon "a showing of cause," the court shall issue the search warrant.  See K.S.A. § 47-1709(k).

In sum, defendant has not established that (1) boarding and training kennels are a closely regulated industry; (2) it has a substantial interest in regulating boarding and training kennels; and (3) warrantless, unannounced searches are necessary to further its interest. The closely regulated industry exception therefore does not apply to defendant's warrantless searches under the KPAA. Accordingly, by authorizing warrantless searches of boarding and training kennel facilities, K.S.A. § 47-1709(b) facially violates the Fourth Amendment. The Court finds in favor of plaintiffs on Count I.

**III.    Whether Compelled Consent Violates The Unconstitutional Conditions Doctrine**

In Count II, plaintiffs allege that because K.S.A. § 47-1709(b) coerces Johnson to waive his Fourth Amendment rights, the compelled consent requirements violate the unconstitutional conditions doctrine. "The unconstitutional conditions doctrine forbids the government from denying or terminating a benefit because the beneficiary has engaged in constitutionally protected activity." Petrella v. Brownback, 787 F.3d 1242, 1265 (10th Cir. 2015).

Under the KPAA, acceptance of a license constitutes an operator's consent to warrantless inspection of the licensed premises. An operator must renew that license annually and again consent to warrantless searches of the facility. Because warrantless searches under K.S.A. § 47-1709(b) are unreasonable and violate the Fourth Amendment, conditioning the mandatory annual license renewal on these warrantless searches violates the unconstitutional conditions doctrine. The Court finds in favor of plaintiffs on Count II.

**IT IS THERFORE ORDERED that the Clerk of the Court enter judgment in favor of plaintiffs on Counts I and II. The Court enjoins defendant from conducting warrantless searches under specific provisions of the Kansas Pet Animal Act, K.S.A. § 47-1701 et seq., and accompanying regulations. As agreed upon by the parties, the Court enters the following**

injunction:

## Injunction

Defendant, and the Kansas Department of Agriculture's officers, agents, employees, attorneys, servants, assigns and all those in active concert or participation who receive, through personal service or otherwise, actual notice of this Court's order, are hereby enjoined from conducting surprise, routine warrantless inspections—as set forth in K.S.A. § 47-1709(b) and K.A.R. § 9-18-9(a)–(b)—of boarding and training kennel operators, as defined in K.S.A. § 47-1701(p), and boarding and training kennel premises, as defined in K.S.A. § 47-1701(q), and their records.

Defendant, and the Kansas Department of Agriculture's officers, agents, employees, attorneys, servants, assigns and all those in active concert or participation who receive, through personal service or otherwise, actual notice of this Court's order, are enjoined from penalizing any licensed boarding and training kennel operator or taking any enforcement action against any licensed boarding and training kennel operator to the extent that the penalty or enforcement is triggered either by (1) defendant, or his officers, agents, employees, attorneys, servants and assigns, attempting to conduct a surprise, routine warrantless inspection of boarding and training kennel operators, the premises or records or (2) a licensed boarding and training kennel operator's refusal or failure to make its facility or records available for a surprise, routine warrantless inspection. The statutes and regulations implicated by this prohibition against penalties or enforcement arising out of or relating to surprise, routine warrantless inspections of boarding and training kennel operators and records are: K.S.A. § 47-1701(dd)(1)(C); K.S.A. § 47-1706(a)(2); K.S.A. § 47-1706(a)(11); K.S.A. § 47-1706(e); K.S.A. § 47-1707(a); K.S.A. § 47-1707(c); K.S.A. § 47-1709(b); K.S.A. § 47-1715(a); K.S.A. § 47-1721(d)(1); K.S.A. § 47-1727; K.S.A. § 47-

-22-

1735(a); K.A.R. § 9-18-7(b); K.A.R. § 9-18-8; K.A.R. § 9-18-9(a), (b), (d), (e) and (g); K.A.R. § 9-18-18.

Defendant, and the Kansas Department of Agriculture's officers, agents, employees, attorneys, servants, assigns and all those in active concert or participation who receive, through personal service or otherwise, actual notice of this Court's order, are enjoined from conditioning the renewal and a boarding and training kennel operator license, as stated in K.S.A § 47-1709(b), on a waiver of Fourth Amendment rights by requiring a licensee to consent to surprise, routine warrantless inspections pursuant to K.S.A. § 47-1709(b) and K.A.R. § 9-18-9(a)-(b).  Nothing in this injunction impacts defendant's ability to conduct surprise, routine warrantless inspections of any other category of facility that is licensed under the Kansas Pet Animal Act, K.S.A. § 47-1701, et seq., or impacts defendant's ability to inspect boarding and training kennels subject to a criminal search warrant, or impacts defendant's ability to conduct an inspection pursuant to the procedures set forth in K.S.A. § 47-1709(k), or pursuant to K.S.A. § 47-1709(a) (initial inspection), K.S.A. § 47-1709(c) (complaint based inspection) or K.A.R. § 9-18-9(c)(2) (complaint based inspection), (c)(3) (change of ownership inspection) and (c)(4) (untimely renewal inspection), or to conduct an inspection with the knowing, intelligent and voluntary consent of the licensed boarding and training kennel operator.

Nothing in this Injunction prohibits defendant from penalizing or taking enforcement action against licensed boarding and training kennel facilities for violating any other provision of the Kansas Pet Animal Act or its implementing regulations, that is not related to surprise, routine warrantless inspections pursuant to K.S.A. § 47-1709(b) and K.A.R. § 9-18-9(a)–(b).

The Court immediately and permanently enjoins defendant, in his official capacity, and the Kansas Department of Agriculture's officers, agents, employees, attorneys, servants, assigns and

all those in active concert or participation who receive, through personal service or otherwise, actual notice of this Court's order, from enforcing or directing enforcement of the above statutes and regulations, as set forth above and in this Court's <u>Memorandum And Order</u> dated June 11, 2025.

Upon entry of this Injunction, the Court shall issue a final order resolving all claims in this case.

The Court retains jurisdiction over this action for the purpose of monitoring and ensuring compliance with this Injunction and resolving any subsequent fee petitions or other post-judgment motions.

Dated this 11th day of June, 2025 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge